The next case on calendar is Woods v. Myers. Good morning, Your Honors. Good morning. May it please the Court, my name is Tom Javits and I represent the appellants, a class seeking class-wide injunctive relief and declaratory relief only to remedy system-wide failure to provide medical care to immigration attainees at the San Diego Correctional Facility. The class does not seek any damages, does not seek any individual injunctive relief. This is precisely the type of case Forge Rule 23b-2 was designed. I'd like to begin with the district court's B-2 concern about whether or not class-wide relief might be appropriate in this case. Before you get to that, could you help clarify what it is about the operation of the medical policy? What is the medical policy you're challenging? It seems to be the emergency care proviso. I'm trying to figure out who it is you're trying to protect and under what circumstances. Ultimately, as I work through this, I have some concerns about, just speaking for myself, about the district court's jumping ahead to envisioning a precise injunction, but I'm still trying to figure out what it is you're challenging, because the policy, at least the DIHS policy as I read it, talks about providing care on an emergency basis and then talks about life-threatening or other threatening circumstances on a case-by-case basis. And I'm trying to understand, so what is it that you're asking the federal court to do in this process as a matter of intervening in the operation of the detention center? I would like to add to that, what category of medical cases require preauthorization? To answer Judge Fletcher's question first, I'll just say that preauthorization is required for any medical care that is not provided on-site at the facility. And so whether you're requesting specialty care to see an orthopedist or an eye doctor, if you're requesting an MRI or a biopsy, anything that's not considered to be an emergency health need where you have to rush someone to the hospital because there's an imminent threat to their life, limb, hearing, or sight, that requires prior authorization from the headquarters office in D.C. So, for example, if someone is diabetic and comes in and begins to exhibit conditions of insulin deprivation or shock or anything like that, if it rises to the level of an emergency and it can't be treated on-site, emergency would allow for going any preauthorization. So if a person comes to the facility and is diabetic and they require services at the facility, such as continual monitoring their blood sugar, for instance, or prescription medication delivery on a regular basis of their insulin, those are services that can and should be provided at the facility. And this goes to your initial question, I think. Our challenge is certainly broader than a challenge to the specific emergency language of the DIHS covered services policy. Okay, but let me give you a specific example. Justice Ginsburg recently, famously, and fortunately there was good interception of the problem, was admitted to Washington, D.C. hospital, and there was early detection of pancreatic cancer. Now, as I understand, that was off-site. I mean, presumably that would have been off-site if that happened to a detainee. That is the kind of preauthorization that would be required. Yes. And, okay, so as it existed at the time, it's not clear that it would ñ are you saying it's not clear that that would have been treated as an emergency? It only became evident that it was an emergency after they did the operation. Yes. The complaint is replete with examples just like that. The Francisco Castaneda case, which has details of the complaint and has been addressed by this Court already, looks at a detainee who had very obvious symptoms, lesions on his penis that were bleeding and discharging constantly over an eight-month period. And the government's response, the CCA's government's response in response to a request for medical care, were that this was an elective surgery to get a biopsy, that it was a preexisting condition, therefore, pursuant to their official policies, it's a written response from the health service administrator of this facility, his care was not being ñ was necessary, appropriate, and followed their explicit procedure. So that's ñ okay. So take that example, then. That's what I'm having ñ that's why I asked my initial question. Right. What is it? Is it the policy or is it the application to particular cases, the Justice Ginsburg hypothetical analogy or the actual case of penile cancer? What is the challenge you're making? The policy that we are challenging in this case is the defendant's refusal to provide necessary medical care services at this facility. And it's very similar to the type of challenge that we see in Hoptow at V. Ray, Todar at V. Ward, all of these cases that look at the government's failure to provide necessary ñ appropriate access to necessary medical care at a facility. So they would have to have MRI, they would have to have ñ No. ñ a mammogram, they'd have to have all the top-flight equipment? Absolutely not. The facility ñ first of all, I mean, this goes explicitly to what happened in Hoptow at V. Ray, where the district court did issue inductive relief, and the answer could say, hold on a second, why don't you give the defendants a chance to figure out what they want to provide here. If they want to provide all those services on site, that's great. If they want to have a system of access in place so that if you need those services, they can bring you up to get them easily, then that's fine as well. So you're challenging the delay inherent in the preauthorization? That's one element of the problem. But the problem is far broader than that. There are many problems directly on site at this facility that go to their staffing of dental needs, for instance. And that's something that in Hoptow at V. Ray was identified, inadequate medical staffing. Another problem related to staffing is their over-reliance on low-level providers who act without sufficient physician supervision. Another problem on site is that they have a delayed response to sick call requests directly on site, irrespective of the off-site policy. So, for instance, the government's own Office of the Inspector General, when they investigated this facility, found that more than half of the detainees don't get health examination within 14 days of arrival and don't get responses to their written requests for medical attention within three days of submitting those requests. Moreover, as in Hoptow at V. Ray, again, there are entire categories of medical care, mental health, dental vision care, that pursuant to official written policies by the government are effectively ignored and effectively denied. My counsel, I've got a question for you, because I wanted to make sure I understood the significance of the claims. Some of what you're challenging sounds like it's peculiar to the San Diego facility with inadequate staffing or whatever, or misapplication of policies. But the last thing you said, and I think some others probably relate, as I understand it, to challenges to regulatory or other policies that would apply throughout the system. Is that right? Are you challenging policies that would have an impact if you got relief in hundreds of centers? If that relief was necessary to remedy the problems at this facility, then yes, that might be necessary. But effectively, the core of our case is that we're looking at the main plaintiffs at this one facility. And so this isn't the type of case where we're challenging medical care across the entire state of California or we are challenging nationwide discriminatory practices at thousands of different stores. We're simply looking at this one facility and the significance of those policies to say that those national policies, which, yes, do apply nationally, they have a direct effect on the detainees in this class. They injure the rights of the detainees in this class. And so if it's necessary to have conjunctive relief at that level. I understand your class is limited and the relief is aimed at that class. But I was trying to understand to what extent you're challenging regulations or policies that would be in place elsewhere. We're challenging it only to the extent that those violations harm the main plaintiffs in this class. So, for instance, if there are certain aspects of the policy that don't affect our class, we're not going to ask the court ever to find that they are unconstitutional and enjoin those practices. Does this DIHS policy, the written policy that's in place, is that applicable to all detention facilities? It is. Yes. And you're attacking that? Well, again, we are attacking it as it's implemented on this class. So it's as applied. It's similar to how Armstrong v. Davis did an as applied challenge. I'm asking what you're doing. Yes. Yes, that's right. Okay. That's right. It doesn't help me to go off on. I don't have those all memorized. Okay. Tell me what you're doing. It's been a while. Okay. The Todaro v. Ward case I think is really critical here. And that's where one of the most fundamental errors of the district court took place. The court treats Todaro v. Ward as if it were a cautionary tale, an example of the vague and incomplete, the district court's words, relief that can be offered to suffering prisoners. But Todaro v. Ward is a success story. It's an example of exactly what a court can do and should do when confronted with this sort of situation. In Todaro, the district court certified a class just like ours. It looked at all the evidence. And it concluded that certain aspects of the prison health care system were grossly inadequate and placed all of the prisoners at a substantial risk of injury. The court then asked the parties to go off, meet, confer, come up with a joint remedial plan. And then based upon that information, issued narrowly tailored relief. Now, I have a question. I was going to wait until the end, but I'll put it on the table now. And I don't expect either side to respond to it in terms of making any commitments. But this strikes me as a systemic kind of case that I'm not sure. I have some questions whether class action is the most efficient way to address it. Has mediation been tried in this case? Has any thought been given to the parties sitting down together and trying to work it out through mediation? We have a wonderful mediation service here in the Ninth Circuit. That hasn't yet happened in this case. The same parties with a similar class, as the district court mentioned, was involved in an overcrowding challenge at this particular facility. That case was settled. So that would be something that we would certainly discuss. But in terms of the necessity of class certification in this case, I would say that because of the nature of the claims, because of the nature of the class, the fact  that class wide relief is the only way for this case to actually be brought to this court. Can you kind of describe for me what you think is the minimum level or right to care that these individuals have? I think that's an interesting point, actually, because this is definitely still an open issue in this court. At the very basic, if these were convicted prisoners, you'd be looking at the deliberate indifference to serious medical need standard in the Eighth Amendment. But in Jones v. Blantes, this court actually discussed the fact that pretrial civil detainees are entitled to a higher standard of care. And that came up in the Ninth case as well for pretrial detainees. And so I think what we're looking at is we don't believe in the district that the deliberate indifference is required. What we do believe is that detainees are entitled to adequate medical care. And when you try and fashion a relief for that and figure out what systems have to be in place to ensure adequate medical care is provided, that's where the level at which you're going to be looking at things. You're going to be trying to make sure that the policies and practices that are in place at the facility are sufficient to ensure that detainees get that adequate medical care, that ready access to medical care that Hopkins v. Ray talks about. The issue with Todaro v. Ward, just to go back to that for one minute, is that Todaro v. Ward really was a success story and did exactly what the Ninth Circuit and the Supreme Court require courts to do in exactly this type of situation. So while the district court said it didn't want to engage in a delicate inquiry that would be required in order to issue an order that says to meet and come up with a remedial plan, that's what the court has to do. Hopkins v. Ray reversed the district court for not doing that. And Pecunio v. Martinez, again, cited by the district court as a proposition that institutional litigation can be difficult. Well, yes, that's true. But in Pecunio v. Martinez, the Supreme Court goes on just a sentence later to say notwithstanding those difficulties, courts must defend constitutional rights. That's all that we ask the district court to do here by simply certifying the class and allowing us to go forward with a discovery. And by refusing certification, the court effectively ended this litigation, ended the ability of these attainees to get relief. If possible, we'll reserve the rest of my time for rebuttal. No, it's possible. Thanks very much. I recommend it, actually. May it please the Court. My name is Victor Lawrence, and I represent the Federal appellees. With me at counsel table is Eileen Gilbride, who is counsel for Appellee Correction Corporations of America. We've arranged to split our time such that I'll have the first ten minutes and Ms. Gilbride will have the remainder. Just so I understand the relationship, the Department of Justice is overall responsible for the detention centers, but they subcontract out to Corrections Corporation of America? That's exactly right. Not every detention center works in that exact manner. Some are actually operated and owned by the government. Yes. No, I didn't mean that they were all subcontracted, but that's the relationship. That is correct. And the Justice Department, like the DIHS policy that we have here, is a Justice Department policy. It's a policy of the Department of Homeland Security. I'm sorry. We're going back to old days. That's right. Yeah, the Department of Homeland Security is the overall agency. DHS. Yeah, that runs the agency, that runs these detention centers. The Division of Immigration Health Services is a separate entity within that umbrella that does that. Okay. Thank you. Sure. Your Honor, in this case, the district court correctly found that what plaintiffs were attempting to do here was to cobble together a wide variety of different, very varied claims and throwing them under one umbrella that they call inadequate medical care. Well, you know, counsel, I think they're right. Because the question is whether adequate medical care is being provided at the facility. It might be that it's inadequate for a certain diabetic. It may be inadequate for someone who has cancer symptoms. But the overarching question is, is adequate medical care, at whatever level we decide is correct, being provided? Your Honor, with all due respect, let me take a different position. Well, you can, but you know what I have to say. Okay. Look what's happening here, Your Honor. This is a facility that has 700 detainees on a given day that are housed at this facility. In the course of a year, there are thousands of detainees that go through that facility and stay there for a while and then are removed from the country. Sure. So we take all those conditions and we say, is adequate medical care being provided in light of these very difficult situations and the inflow and the outflow? But, Your Honor, look what's happening. They filed a complaint. The plaintiffs filed a complaint with 11 named plaintiffs, two of which were dismissed. So there's really nine plaintiffs remaining. By the way, only three of them. Dismissed because they transferred out, right? Correct. The district court dismissed them. Not because they got relief. That is correct. Does that underscore the problem? I don't think so, Your Honor. Have you ever heard of the proposition that something that is likely to be repeated but can't get reviewed if you don't do it? No, I understand, Your Honor, that principle. But here we have nine named plaintiffs at a facility with 700, nine people claiming these very problems ranging from a failure to monitor hepatitis C to insufficient dental staffing, all varied things. Counsel, I understand. I think both of us, Judge Fletcher and I, understand that. I think I'm going to address the same concerns I had with the plaintiff's case to you. We can think of anecdotal examples. There's the actual example in the history of this facility of a fellow who died of penile cancer, the recent event with Justice Goldberg. We have our own personal experiences with the medical care system. The question that I'm wrestling with is, if there is a standard of care within the correctional facility that is imposed by DHS that there's the overall policy. We deal with prisons all the time. I mean, we have lots of prison Eighth Amendment cases and the like. Judge Henderson up in the Northern District has a colossal class action case going with the California state prison system. So we're familiar with it in that extent. But we're wrestling with the fact that you have, as you say, a thousand detainees in a detention facility, and there's a basic concept that the detainees must be given adequate medical care. Then the question is, what does that mean? And it's got to be variable according to the individuals and the nature of the disease, and the whole policy goes through. It's got dental. It's got all the variable kinds of medical conditions. So that's why I was trying to pin down the plaintiff's end. Are you attacking DHS's overall policy, or are you talking about it as applied? So as applied, are you suggesting that if there is an overall policy that has produced, in individual cases, unhappy results, that the only remedy for addressing the implementation of DHS policy are individual damage suits for, in effect, malpractice or the equivalent of deliberate indifference or the like? What is it you're suggesting? How does one address substandard delivery of medical care in a prison facility? Very simply, Your Honor. These claims, because of the fact that they're so varied, deserve to be brought as individual claims. Again, the government feels that none of these claims have merit to them, but to the extent that the plaintiffs believe they have merit, they could be brought as individual claims and much more efficiently dealt with there, and the individual could get injuncted. How more efficiently? How long would it take each one of these plaintiffs to come in and litigate their particular level of treatment at the San Diego Correction Facility? Had they done that originally, it probably would have been over by now. I mean, two of them left before they came in. Two of them left, and, Your Honor, only three of the nine still remain, but I think it's very interesting that of those six of the nine that have already left that were named plaintiffs, the plaintiffs did not bring individual suits on behalf of those individuals, at least not to that I'm aware of. So they let those claims, in essence, go away, except with the hope that this Court would overturn the class certification. Well, yeah, because they're trying to get systemic relief. They're not going for the damages. Understood, Your Honor. But they could... Quite many of them are going to be deported, and that's why they're there. And so we may be sending them back to their country of origin with cancer or untreatable diabetic condition because it's gone so long. I just think that you're off on the wrong street. With all due respect, Your Honor, this is a situation where these individuals actually, and I say this with all seriousness, have greater access to medical care than many of us in this room. They have a facility right on... That may be a different issue, and maybe that's what you should be arguing. Are you saying, yes, they're all getting adequate medical care? Well, we certainly do believe that. But here we're in the posture of arguing whether the denial of class certification was correct. And we have a situation where the Court, under an abuse of discretion standard, a very limited review, is looking at what the district court did here. And the district court went through the factors of Rule 23a, went through 23b-2, as alleged by the plaintiffs, and determined that there was no insufficient commonality, insufficient typicality, and that the plaintiffs did not sufficiently make their argument under Rule 23b-2. With all that, under an abuse of discretion standard, where the court laid out its facts and explained its reasoning and very credibly did so, this court should basically look at it and determine whether there was a rational basis with which the district court made its decision. And we submit that there was. Did the district court make a finding that there was adequate medical care? It didn't need to. It didn't need to because it was only at the class certification stage. And what the plaintiffs decided to do was once they were denied class certification, rather than pursuing their claims individually, they asked to stay the action in the district court and to pursue this 23F petition on the denial of class certification. But there will be a case at the end of the day, Your Honor, should the plaintiffs choose to make it, that there is inadequate medical care at this facility. But it's the government's position that the district court correctly went through the factors under Rule 23a and 23b-2 and determined that it shouldn't be done as a class action. I think it's very interesting to note, Your Honor, that the one case that the plaintiffs just cited here this morning as the case that this court should look at is a 1977 district court case from the Southern District of New York. That's what they're holding their hat on and saying, look, this is what the court did in this particular case and this is what you guys should do in this case as well. Your Honor, the wealth and the amount of case law and precedent that goes against them is substantial in this matter. And given the standard itself of abuse of discretion where this court and where, excuse me, the district court provided a rational basis for its decision, this court should affirm the district court's judgment. I do want to save time for my co-counsel, but if you have a question. I do.  Usually I don't interrupt if I don't. But here's the question, since you are running out of time. What would the government's position be about a suggested mediation to sit down and try and work something out short of class certification? In other words, resolve the systemic concerns through a mediated effort. Your Honor, with all due respect, it's something I would have to discuss with my clients. Well, then you have to take it back. But you don't go with any policy. You don't come with any preconceived or preordained rejection of a mediated approach. No, I can't do that without talking to my clients. Thank you. I do want to reserve the rest of my time from you, Justice Gilbride. You have. She may. Thank you, Your Honor. Eileen Gilbride for the CCA defendants. I would like to just make three quick points, if I may. First, following up on Mr. Lawrence's comment, I'd remind the Court that affirmance is appropriate absent a strong showing of an abuse of discretion in this case. We're aware of that. Very good. And the second point is I'd like the Court to look carefully at the Shook v. Board of County Commissioners case, Shook 2. The Tenth Circuit case came down in 2008. In that case, the Court held that the district court fell within the boundaries of Rule 23, and it did not exceed the bounds of permissible choice. And this is what we're looking at in this case. In there, it upheld the denial of class certification on that standard of review, stating that individual issues cannot be avoided by formulating an injunction at a stratospheric level of abstraction. And this is what I'm getting at. The plaintiffs here are not complaining that the package at the facility here is deficient. I'd like you to read the complaint carefully. The complaint is framed in terms of various instances of the implementation of medical care being unsatisfactory in different ways. In some cases, this happens. In some cases, that happens. There is no uniform common thread. We can't just say, well, it's just bad in various ways and meet Rule 23. That's not what Rule 23 requires. And my third point is that as to the CCA defendants specifically, the complaint contains no allegations whatsoever of any systemic deficiencies as far as CCA is concerned. It doesn't say that CCA has a policy of ignoring the instructions of the medical staff or anything like that. So certainly, CCA simply shouldn't be here. Who implements the policies? The federal government, the Department of Health Services, or the public health, the U.S. Public Health Service, or USPHS, I believe it's called, United States Public Health Service. All CCA does is contract with the federal government to house these individuals. But you don't provide? We don't provide. CCA does not provide any medical? That's correct. All we do is take direction from the medical services. If this person needs transporting somewhere, then we transport them. The only allegations as to CCA is in one instance, an inmate collapsed in the shower and the guard stood over him until medical care came and didn't perform CPR. In another instance, an inmate was complaining that his cellmate needed help and the CCA guard detention officer didn't do anything. But there is not one allegation of any systemic deficiency as far as CCA is concerned. In my 45 seconds left, I would just echo Mr. Lawrence's comments to affirm the denial of class certification. Again, the trial court did not exceed the bounds of permissible choice, even if this court might choose something different. If there was a reasonable choice by the trial court, it must be affirmed. Thank you. There's three points that I want to address here. Counsel, in your reply, for my benefit at least, could you express why your clients feel you need the corrections facility in the case to get relief, as opposed to just the feds? Sure thing. There are certain aspects of medical care at the facility that do implicate CCA. As Ms. Gilbride already mentioned, some of the emergency care response issues raised by the case involve CCA. CCA's ability to respond to emergency requests for medical attention. But are those issues issues that can be treated by class action as compared with the DHS policy issues? Yes. That's an issue that came up in the district court transcript as well. Policies and training pertaining to how to respond to an emergency situation can be things that the district court can address as on a class-wide basis if the reason why emergency responses are faulty result from failed training or failed policies. In terms of other things, in terms of accommodating treatment offers, in terms of accommodating medical departments' requests for treatment, for lower bunk assignments, for any sort of number of things, handcuffing detainees behind their backs that have existing conditions. Thank you all. Okay. Thanks. Thank you. And maybe Judge Fischer could give you an extra minute or two since I... He'll keep on going. One thing I do want to respond to in this camp on Ms. Gilbride's statement, she said the complaint, if you look at it, contains a number of individual instances of medical deprivation. Now, that's sort of interesting because if you look at the Second Circuit opinion in Todaro, which the district court and opposing counsel continually refused to acknowledge that the case was affirmed by the Second Circuit and praised by the Second Circuit, the Second Circuit stated, while a single instance of medical care denied or delayed or viewed in isolation may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities... Flood us. Flood us, counsel. I'm sorry. Repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures. That's exactly what happened in Armstrong v. Davis, too. If you look at individual instances and you prove that they demonstrate a policy of failing to provide necessary medical care, it's exactly how these things work. Ramos v. Lamb in the Tenth Circuit, same thing. This is exactly how these things happen. Hopps v. Gray, same thing. On the Shook case, though, and this comes up because Mr. Lawrence mentioned that there is an amount of precedent against us that is substantial. This is interesting. If you look at the district court's decision... But you talk a little slow. I'm sorry. I get worked up. We'll give you one more minute if you'll slow down. Sure thing. I apologize, Your Honor. Thank you, Your Honor. If you look at the district court's decision, there isn't a single prison or jail challenge or conditions of challenge of any sort that the district court cites against us that says this denial of class certification is appropriate. They cite Ramos. They cite they tried to distinguish Dean v. Coughlin, Bradley v. Harrelson, Sotomayor v. Ward. These are all cases where class certification was approved. There are medical care challenges, and the district court doesn't cite a single one of those cases. The defendants don't cite a single case in which class certification was denied in an institutional prison jail challenge. The only one is Stevens, this challenge in the district court of California, Eastern District, which involved a challenge to ten different facilities, eleven different facilities, and then Shook. Shook two. I would submit, as an initial matter, Shook two is just wrongly decided under Ninth Circuit law, certainly, and under Supreme Court law as well. If you look at Shook two, one of the considerations that the Supreme Court, that the Tenth Circuit accepted there was manageability concerns in a B-2 class. And even in Shook two, the Tenth Circuit said our law on this is different from the Ninth Circuit. I have Shook, the Tenth Circuit has said in 2004. Yes, and that's Shook one. That's Shook one. Shook two is more recent. Shook two is more recent, and Shook two is incorrect for a number of reasons. Shook one noted that we were different from the Tenth Circuit. Shook one also stated, yes, Shook one also stated that manageability is not a concern in the Ninth Circuit. But Shook two makes a whole host of additional problems. Shook two imports Rule 65d into the consideration for Rule 23, same thing the district court did here. But under Swerkowitz v. Surima, the only way to import new criteria into Rule 23 or any other Federal rule is through amendments to the rules, not through judicial interpretation. If you look at the specific focus on individual differences, and that's something that really comes up in the district, in the defendant's and also the district court's reasoning in this case. If the unique effect of health care policies, of system-wide policies on individual detainees was sufficient to defeat classification in these cases, how could you possibly explain the legion of class-wide medical care challenges that exist? We're never going to have to have individual cases here. We got it. We got it. Thank you, Your Honor. As we close, I would like to put in a plug for mediation. The things that can be done in mediation that we really can't do as a court that can be very constructive. I'll just give you one anecdote. One of my sons is a medical doctor, but before he entered medical school, he took on a project to determine what was appropriate medical care in a state prison facility in Billingham, Washington. He worked with the sheriff. He worked with the people who were there providing the care in the facility. And determined what was wrong, what they really needed. And their ultimate solution was to find specialist doctors in the community who agreed pro bono to serve as consultants and even to provide some services and show exactly what needed to be done to make it a good facility. And there are all kinds of things that can be done that we can't do here. If it's obvious that there's need for change, it seems to me mediation is where you ought to be. All right. Thank you. Counsel, you can sit down, but I'll address my remarks more to counsel for the government since I'm somewhat familiar with your structure. I was the associate attorney general when the ADR policies of President Clinton were implemented. And so I know that there has been successful mediation in some of the systemic cases involving civil rights, division, and so on and so forth. We have more recently in this circuit had successful implementation of mediation in the immigration context with DHS under the more recent administration, not the Bush administration. So there is some history of DHS with the Ninth Circuit mediation program. So I would just urge that you talk to your superiors and just give a thought to whether there is something setting aside the antagonism or the adversarialness that systemic problem here that could be addressed through mediation. It's non-binding, obviously. And while we don't order people generally to engage in mediation if they are reluctant to do so. I'm not asking for a commitment, but there are folks within both organizations, I believe, that may have some thoughts about it, and perhaps that would be a constructive approach. Thank you. Do you want a response within a reasonable period of time as to whether they want us to refer? Why don't you let the panel confirm and we'll issue a statement about what we would like back rather than do it here. All right. Fine. Thank you all. Interesting case. Case argued and submitted.
judges: Fletcher B. , Fisher, Gould